Next case, which is Kline and Birdwell v. National Railroad. Last but I hope not least, Your Honors. William Belane for Amtrak. Amtrak and Norfolk Southern are splitting 20 minutes. I will take 12, and Judge Fuentes, with your permission, I'll take 12 minutes. Thank you. We've got a number of important issues here, but I want to focus first and foremost on the issue of the duty owed to trespasser under Pennsylvania law. It's important for two reasons. One, as Your Honors know, we have said that the judge below mistakenly applied the applicable law in Pennsylvania for trespasser liability, and it effectively made new law, contrary to what we think is the public policy of the Commonwealth of Pennsylvania. The other reason why that's important is if we are right, and Your Honors should reverse on that issue, we think that you'd have to remand for a new trial on all issues, regardless of how you came out on the two negligence issues that are there. And we say that because we respectfully submit that the court could not comfortably find that if the wanton willful issue had been taken out of the case, that the jury still would have come up with a result that was that the two trespassers were entirely blameless. So I'd like the court to keep that in mind. I mean, this came out 100% liability for the young men who were where they shouldn't have been, and they knew they shouldn't have been there on that awful night. Now, starting with the trespasser liability issue, what is fundamental to Pennsylvania law, and I think has been built into the law of this circuit in Zimmerman and in the courts of ferments of Heller, is the basic notion that a landowner, particularly railroads, don't have to anticipate trespassers. They may know that children are likely to trespass. They may know that teenagers may be likely inclined to come in to engage in acts that would be considered foolish. But the railroads and landowners do not have to anticipate that. Their argument, though, is that in the circumstances it's not unreasonable, because you have this residential area, you know people are there because of the graffiti, there's people all over the place, so maybe something else should have been done. I mean, your problem here is, of course, you have a jury verdict against you, so it's a little bit of an uphill battle. It's interesting and very troublesome because, of course, the cases we have, Zimmerman being the prominent one, we prevailed on summary judgment, as we should have. In fact, we moved for summary judgment. We believe we should have prevailed on summary judgment here. So it shouldn't make a difference that the jury came out the way it did if, as a matter of law, the evidence wasn't there. And, of course, we principally say the evidence wasn't there because in order to find a specific risk, I mean, that's the point here. They had to establish with evidence that there was a specific risk of harm, not on the ground, not on the tail track, but up the tail track because of the overhead live catenary wire. A risk that you were aware of, but you failed to protect against. Yes, we are absolutely generally aware of that risk. We stipulated that we're aware of that risk. We give special classes to those people who are invitees or employees and belong there. But Pennsylvania law does not say we owe those duties to a trespasser. And that's the key point. We respectfully submit that the evidence that had to be submitted by the plaintiffs was not evidence of something that happened miles away or decades ago or even two years ago if it was far away. You owe a duty to trespassers. Yes, to avoid wanton and willful misconduct. Isn't it wanton and willful misconduct if you are aware of all of these accidents across the country? If Amtrak, in fact, is responsible for rails from coast to coast, and you are aware of numerable accidents involving the same situation, the teenager or a young person, a boxcar, electrocution, but you failed to take preventative measure in Lancaster? No, Your Honor. That's the whole essence of the policy of the Commonwealth of Pennsylvania to try to preserve the right of a landowner and a railroad to engage in legitimate business ventures. And we're talking about here a condition that was part of its legitimate business. We are saying that there is not a high probability at this location absent some kind of evidence. It may not have to be that somebody was electrocuted before, as the appellees have insisted, but something that tells us, you know what, there are young men, anybody, going up on the tail track and, in fact, climbing up boxcars to get to the top. Well, haven't there been accidents like that? Not here. Is that substantially similar to the one in this case? Not here. And we say that, as a matter of law, the evidence that they put in isn't substantially similar because of the discrepancy in the time and the discrepancy in distance under the evidentiary laws. We don't think you should ever be able to get in something that happened 20 years ago at a different location where all we know that makes it substantially similar is, and not all these were the case, a teenager who's on a boxcar near a catenary wire. We are talking about a high degree of probability. We're not talking about a possibility because of things that happen all over the system. I mean, after all, we're talking about thousands of miles of tracks in many years. So if you pull together evidence of 15 or 20 or 30 prior incidents over that span, does that make it highly probable that an incident is going to happen at this particular location at the tail track? I don't mean exactly that spot, but on the tail track. You're talking about your evidentiary objection now, right? I'm sorry? You're talking about your evidentiary objection right now. Well, the two do come, and they come together. Because really, one plays off the other. The judge's view on the reason why that evidence was admissible, obviously, was part and parcel of the judge's view that it's also relevant to prove Wilf and Wattenman. But you're equating substantially similar to accidents that are precisely identical. No. Oh, no, no. No, Your Honor. We're asking for what actually the Pennsylvania Supreme Court asked for in Stormer, which is substantially the same time and place. And if Your Honor looks at I think it's the Frischia case, it's an old case in the Third Circuit that actually applies Pennsylvania law, that court actually upheld the trial court that allowed in some prior accidents. But the prior accidents that were allowed in were at the same location and actually during the same time frame, at night as opposed to during the day. There's got to be a limitation on what's considered substantially similar. Otherwise, Your Honor, what happens is the next time, if we lose this case, the next time we are going to be off with the first. The plaintiffs are absolutely going to be looking not at what happened at a particular site of an accident, as traditionally would be the case. They're going to be looking throughout the system. They're going to be trying to find common accidents, that is, something with somebody who's hurt in a similar way. They're then going to try to bring in all that, and we're going to be off and running on a series of mini-trials trying to show why they're all different. So there's got to be a temporal nexus as well as a citus, I suppose. Precisely. What was the analysis that the district judge had to go into in order to admit this evidence? Well, the analysis he went into. I mean, was he required to go through each and every one of those accidents that the plaintiffs sought to introduce? Well, there has to be some kind of threshold. For example, if it's at the same location, Your Honor, and if it's within the past few years, then he might be able to say, you know what, plaintiff's met his burden and now it would be up to the defendant to show why he shouldn't let this particular accident in. But to pull something that's 20 years ago and from not even, not off the tail track, not in Lancaster, Pennsylvania, and in many cases not even in the state, that's something which facially we would submit. The judge would have to say, that's not enough, Mr. Plaintiff's counsel. You can't do it. Because if you do do it, we're going to be off and running on all of these little mini trials, which is what 403 is about. In other words, this is assuming relevance. And obviously, Your Honors understand, we say it's not relevant in the first place. Tell us why it's not harmless error, if it is in fact an error. Oh, on this particular issue, I think my starting point is actually fairly simple. We know what these young men did and how foolish it was. The jury found them blameless. The judge, by the way, wouldn't even give the charge that young men 14 years and older can be presumed to be guilty of comparative negligence. But be that as it may, he found them entirely blameless. We'd submit that if you took out wanton and willful from the case, a jury assessing this, I don't think you can fairly say, would truly come up with the same result of saying, you know what, 100% for the railroads, zero for the plaintiffs. Well, if we were to agree with you, obviously you'd have to go back for a new trial, right? Yes. Yes, Your Honor. Go ahead. Okay. Thank you. Let me ask you a question. Please. You started out by suggesting that if the evidence of prior incidents or accidents were removed, that ends the case, as far as you're concerned. Well, my starting point was that if we're right that as a matter of law, the judge should have dismissed the wanton and willful charge from the case. But if that's out of the case, then there is no case, I think, according to what you said earlier. Yeah. No, no. My first point is this. If you knock out wanton and willful, as the judge should have, he should have done in summary judgment, but he at least should have done it at the end of the plaintiff's case. You still have attractive nuisance, right? You still have attractive nuisance. There's still a 386 the co-counsel will talk about. What I am saying is you can't comfortably look at the result here, say 100-0. Oh, it would have been 100-0 anyway. When you say throwing it out, throwing it out when? Well, either it never should have been given to the jury from the very beginning of the case or the judge at the end of the plaintiff's case should have said, listen, I have to take that out of the case. Even if he allowed in the other evidence, Your Honors, he still would have given limiting instructions, I think. I mean, now the jury viewed that evidence as relevant to knowledge in a case where they're allowed to put on a case of willful and wanton misconduct. And by the way, since they found willful and wanton misconduct, it's no question the jury was right in saying it's 100-0, but only because they found it was willful and wanton. The problem is there wasn't an evidentiary basis for finding willful and wanton. How does an internal legal memo make it into this trial? Beyond me, Judge. How does it get released, period? It's beyond me, Judge. I can't stand here and give you a good answer as to why that ever got into the record. Mr. Maloney, thank you very much. Yes, thank you, Your Honor. We may have to add some time for plaintiffs. Yes. Now, I believe, two minutes. If it makes sense, we'll have counsel argue the three reasons. Very good. Ms. Winkleman. Good morning, Your Honors. Nancy Winkleman for Appellant Norfolk Southern Corporation. In my few minutes, I'd like to focus my argument on two points. The first one is why Norfolk Southern was entitled to judgment under Section 386 of the restatement, which, of course, was the only theory of liability asserted against Norfolk Southern. And the second is why Norfolk Southern was entitled to judgment on plaintiff's punitive damages claim. On the first point, as the Court is aware, 386 is a narrow and rather obscure provision in the restatement that applies and has been applied in very limited situations which are not present here. In fact, between the parties, we've only found 12 cases since 386 was adopted as part of the first restatement in 1934. And they all involve the same basic fact pattern, and that is this. A nonpossessor comes on of the property, comes onto the property, and does something. Reichwalder, the Pennsylvania Supreme Court case, which is the only Pennsylvania Supreme Court that's ever even mentioned 386, is the classic situation. The nonpossessor comes onto the land, creates a condition. The possessor of the land has nothing to do with it, has no involvement with it. The nonpossessor is acting on its own behalf, not on the possessor's behalf, and something goes wrong and somebody gets injured. And in that situation, in each of those 12 cases, the courts have held that 386 could be applied. The outcomes, of course, have been different, but that's the situation where 386 applies. Here, everyone agrees, and for purposes of this argument, will accept that at a minimum, Norfolk Southern and Amtrak were jointly responsible for the condition. Each played a role. Each did or didn't do certain things. The district court so found, appellees have so conceded, and that will be the starting point. So the question then becomes. Can I ask you a question on that? Absolutely. I'm just a little unclear. I read your brief on page 21 and other places. Now, Greta, I just want to understand. Did your client pick the exact location of where it parked its car, or did Amtrak say you've got to pull it all the way down? In other words, you've got to pull into this space, and you complied and put it in that space, versus anywhere along here, and you just happened to put it here. Just stepping back, of course, Amtrak gave Norfolk Southern permission to come onto the property to begin with. And then I believe that Deborah Kelly testified that it was then Norfolk Southern that decided where specifically within that 1.2 miles of tail track, Norfolk Southern could park its cars. Did the catenary line run the entire length of that 1.2 miles? I believe that's the case, Your Honor. Okay. Thank you. But getting back to the point here, or to the point that I think is critical, is in contrast to every other case under 386, here we have a situation where both parties played a role. So the question then becomes, in that situation, should 386 apply? And, of course, we submit that the answer to that is no. If the non-possessor creates or maintains a dangerous condition, doesn't that subject the party to liability? In each of the cases where that party has been subjected to liability, it's where the non-possessor has had total control of the situation, is acting solely on its own behalf, comes onto the property, digs a hole, someone falls into the hole, leaves its scraper, its piece of machinery, in an open lot where children can get to it. The possessor has had nothing to do with the creation of the condition. All of this was presented to a jury, though, as a fact question. The jury made its decision against Norfolk. I mean, it's a very high bar that you have to get over. Judge Fuentes, I certainly appreciate the bar with the jury verdict, but as Mr. Blaine said, and I think on 386 it holds equally true, this never should have gone to a jury. When there's a situation of co-creators of a condition, which is what we have here, there is no case that's ever applied 386 in that type of situation. And it would be not only unprecedented, but it would lead to an illogical, and I would say even a perverse result, to hold the entity in Norfolk Southern's position, the non-possessor, liable under a negligent standard, which of course is what 386 imposes. Whereas the possessor, the entity in Amtrak's position, is held liable only under a willful and wanton standard, as Mr. Blaine has argued. I understand the district court initially agreed with your view. And I would say first instincts sometimes are the correct instincts, because in fact, that was correct. Norfolk Southern never should have been in this case at all. 386 just does not apply in this situation. But of course we have to address the history of the case, and that means that we have to look at the judge's subsequent order on reconsideration. You were brought back into the case. Correct, Your Honor. And what was the specific reason the court gave for bringing Norfolk Southern back into the case? Nothing had changed. The court had fully addressed the 386 argument the first time around. It addressed it the second time around. It changed its mind. The facts hadn't changed. There hadn't been any facts developed. We were still on summary judgment, of course. I think the district court, you know, if this court reads both of its rulings there, it will see that the court just simply changed its mind. And in our view, its first inclination was the correct one. I want to move to punitive damages before I run out of time. Let me ask a question. You know, there are cases, I think including in the Third Circuit, that say a summary judgment can't be revisited if that issue has been tried on the merits. Are you familiar with those cases? I am not, Your Honor. I understand the general principle, though, yes. And the general principle is, well, it's really a waste of time to look at the summary judgment because you've got to look at the trial anyway. So why shouldn't that case or line of cases apply to your situation? Well, we also, of course, move for directed verdict and for JNOV after trial. We don't think the jury ever should have had the 386 claim. Why shouldn't we just go straight to the trial? Well, 50, right. Whatever route the court goes. You think the result will be the same under each? Exactly. Because there hadn't been any new facts developed. All right. So, yes. And if I was misleading in my argument, I apologize. Go ahead with your punitive damages. On punitive damages, I'm not going to repeat, you know, all the Pennsylvania law, but obviously this Court is familiar with this very high standard extreme remedy. And of importance here, when you're talking about reckless indifference to the rights of others, the key is that the defendant need to have a subjective appreciation of the risk of harm to which the plaintiff was exposed and then acted in conscious disregard of that risk. Measure that exacting standard. I invite this Court to measure that exacting standard against the evidence with respect to Norfolk Southern. None of the evidence that plaintiffs used to support their punitive damages claim had anything to do with Norfolk Southern. There was no evidence that Norfolk Southern had any knowledge of the prior electrical contact accidents that were discussed in Mr. Blaine's argument. No evidence that Norfolk Southern had any knowledge of any of that. No evidence that Norfolk Southern had any knowledge whatsoever of any trespassers in the vicinity, of any graffiti in the vicinity. None of it. Plaintiff's entire punitive damages case against Norfolk Southern was that it knows that catenary wires are dangerous because it trains its employees about the dangers of catenary wires. We accept that. We agree with it. Norfolk Southern, of course, trains its employees. But the fact that it knows that catenary wires are dangerous is not the type of evidence or knowledge of a specific risk of harm and reckless indifference, conscious disregard of that risk that could possibly support a punitive damages claim. I see my time is up. Thank you. Ms. Winkleman, thank you very much. Mr. Rota, we'll add three minutes to Mr. Rota and be flexible if you need more time. Thank you, Your Honor. May I just set something here? Sir, we're somewhat conscious of speaking into the microphone, so I'm afraid you might have to juggle back and forth. I will. Thank you very much, Your Honor. Joseph Rota for Jeffrey Klein and Brett Gordwell, Your Honors. May it please the Court, I'll address some things in common first and then answer Your Honor's questions as to either of the railroads. Judge Stengel is a judge with 20 years' experience on the state and federal trial benches. He presided over this case for four years during pretrial, 12 days of trial, six months of post-trial briefing and argument, and then issued his 59-page opinion, which by any measure I think must be considered as careful and thorough. He summed up the evidence, as he saw it, based on his experience with the case. On page 37 of his opinion, where he said, a simple truth of this case is that more than sufficient evidence was submitted in support of each claim. Another simple truth is that Amtrak and Norfolk Southern really submitted no evidence, almost no evidence of any substance. One of the biggest parts of this case was your evidence of other accidents or incidents that involved electrocution, catenary wires, and the rails. Yes, Your Honor. And Mr. Belay made the point, and my research fails to disclose any case anywhere that allowed the introduction of similar accidents where the accident did not take place at the same location in question. Your Honor, with this – Do you have any case law support for the admission or introduction of that type of evidence? Well, yes, Your Honor. We cite in our briefs cases where there have been accidents at other locations if they meet the test. The test is – and I think that the railroads misstate the test. They keep saying time and place. When you look at the Third Circuit's opinion in Barker, which they cite, the rollover with the tractor, the test is substantially similar facts and circumstances. Time and place are among those, but they're not the only. Every case that I have looked at, in every case, substantially similar, always includes the same place of the accident. Okay. If I might put in perspective, I think there may be a misunderstanding, Your Honor, as to what this evidence was used for. We claimed that Amtrak knew the risk of boys climbing on trains parked under catenary lines. To prove that, we introduced this evidence that Your Honor is referring to. The evidence was only introduced to show their state of mind, that they knew there was such a risk. Judge Stengel cautioned the jury when it was introduced. It was only for state of mind. We argued it only for state of mind in the closing arguments, both liability and damages. We said the same thing, and the judge recautioned the jury. It was just to show that they were, in fact, aware, that if you have – Well, to show that they were aware of it, and they were wanton in their conduct by disregarding – Exactly. – that information. But you're still introducing the evidence to establish that they acted in wanton disregard of a trespasser. Yes, Your Honor. But it would have been a different case if they had come in and said, we never heard of this kind of accident before. We didn't anticipate this would come. Maybe we should have, but we didn't anticipate it. This evidence was directed to refute that, and it was only for that purpose. And when we look at what are the substantially similar facts and circumstances, as the rule requires, we have here an admission by Amtrak, by virtuous documents, that what they consider the substantially similar facts and circumstances for an accident like this is the triad, the train under a catenary line and boys with access to it. Their memoranda did not say when they predicted, and our briefs cite the statements from it, when they predicted there will be more of these accidents or when they grouped the accidents that had occurred. They didn't say they've been in Trenton because of the configuration of the train or Boston, whatever. They didn't say there will be more in Trenton because of its peculiar. They took their entire northeast corridor and lumped every electrocution accident like ours and said, these types of accidents are a problem for us. There have been X number, there are more pending, and there will be more of these types of accidents. That showed that they recognized it was a function of those three things that I mentioned. Plus, Your Honor, if I could go to a point that they entirely overlook, it would have been one thing if we had had a remote desert island location and we were trying to show that Amtrak should have been on notice that this type of accident could happen at that remote location. We couldn't really expect boys to be around. And to show that notice, we had brought in evidence of accidents happening in urban areas. Or a different time. Let's say that Amt Norfolk Southern had pulled its train in at 3 o'clock in the morning on a January freezing day. Not much likelihood that there would be kids around at that point. And if we had tried to prove notice that there could be through accidents that happened in the summer, that would be apples to oranges and there might be an objection. Our case was an August weekend in the summer at this highly residential, very populated, very foreseeable place. You couldn't get a better location, a location where this accident was more likely. It isn't as if any of these other cases would have occurred at a more likely configuration of time and place. So there was no prejudice, even if we did have to look at time and place, which respectfully I don't think we did because of the very limited purpose. Did they know this could happen? Then the inquiry becomes, are you likely to have a boy? Two of the three variables were there by virtue of what they did. Do you distinguish the Zimmerman case, which involved a very, very similar accident, electrocution, where the case was dismissed on, I believe the case was dismissed on summary judgment, because there was no evidence of an identical accident at that location. Your Honor, respectfully, Zimmerman is not an identical case for this reason. Zimmerman, Your Honor, may be familiar with, of course, 20th to 30th Street, the area of the tracks. It was the hub of the public transportation, the rail transportation in metropolitan Philadelphia. A 20-year-old man hopped not one, but two fences of wall to get into those tracks, walked across, went to a catenary line, climbed up the catenary line, sat on the crossbar right where the wires are, and got electrocuted. There was no evidence that SEPTA, which was sued, or Amtrak, was aware of prior of people climbing catenary poles like this at that location or elsewhere. Our case is markedly different for one reason, first of all. It showed that our type of accident is very foreseeable. It has been discussed by the federal government. The reports that we introduced, independent of Amtrak's documents, the reports by the federal government pursuant to the National Railway Act surveyed the industry to find the most frequent causes of injury to the public. Isn't the problem that trespassers are not necessarily foreseeable, and that's why you have the elevated standard when trespassers are involved? The elevated standard of liability. Well, you wanton, yes, wanton, and callous disregard for the rights of others. Yes, Your Honor, you do, but no duty to anticipate goes only so far. No duty to anticipate if there is no reason to anticipate. The way they articulated that as a landowner you never have to anticipate would eviscerate the rule. There would be no liability for wanton conduct unless you actually see the person there. That's not what the wanton conduct rule is. And by the way, they keep saying willful and wanton. We never asserted a willful claim. It was just wanton conduct. Back, if I could, to Zimmerman, Your Honor. So you have those distinctions. The general risk in Zimmerman was the general risk in our case. You could have trespassers. The specific risk, though, that this Court said was not shown was that one of those trespassers would scurry up the pole. In our case, there was evidence for the jury that it was foreseeable that boys around parked, very accessible trains will scurry up the eight rungs of the train. There was evidence in our case that wasn't in Zimmerman. But there is another fundamental difference between Zimmerman and the railroad cases, Dugan, Heller, Edwards, where a boy climbs up on a railroad car. Fundamental difference, and it's the key to this case. In those other cases, the power had to be on. In those cases, the train stopped on a main track during a scheduled run for a signal or an uncoupling or something like that briefly in daylight. Nobody, even the plaintiffs, even contended the power should have been off. You did raise a point that I'd like to ask you about because I could not tell from the judge's analysis of these prior accidents whether he, in fact, looked at each one and determined whether they were substantially similar because it seemed like the conduct of the plaintiff in those cases may have varied from one case to the other, which is different from what happened in this case. In some of those cases, there were flights from police, maybe substance abuse, maybe the cars were, the trains were moving, etc. But it didn't seem like the judge was parsing out those cases in order to determine that they were indeed substantially similar as to time, place, and so forth. Again, Your Honor. Is that an error? Well, there was no, yes, Your Honor is correct. We did not go through the individual cases. We didn't have information about those cases other than what Amtrak said in its documents. And by the way, to answer Judge Shigari's view, we became aware of these documents by virtue of the Amtrak Conrail litigation in Washington, D.C. in the 1980s. These documents were identified as exhibits in those cases. Okay. And we got them that way. They were public record. Okay. But back to this, Your Honor. We weren't, again, saying this accident involved a drunkard. Our boys had no alcohol or drugs. It was not that involved. It was simply that Amtrak, you have to admit, you knew that where you have this combination, this environment, where kids can walk right up to a train, they can get hurt because they're going to go up there. And that's all. That's all it was. Then we had to look at the specific evidence in our case. Did they have reason to foresee that there would be boys around these parked trains? Back to the other case, though, Your Honor, the Dugan case. Our case, in our case, there was absolutely no need for that wire to be on. That wire was there to power trains that were moving along that track. That weekend, there were no trains that were going to move along that track. It was being used not as a track to run trains back and forth. It had become a long-term parking lot that Amtrak was leasing out to Norfolk Southern, Norfolk Southern's main yard, which had no catenary lines. They had been taken down about a decade before for safety reasons when they needed space. Given how lethal that high voltage was, it should have been turned off. The ability to turn it off, as Your Honor alluded to, I think, a moment ago, was part of the system. There are two design features for catenary lines because of how dangerous they are. One is their height. They're hung at 21 feet. It's a very, very impractical – I shouldn't say impractical, but it's a very difficult thing to do to just shut down the power to then start it up again. And what you're suggesting, of course, is nationwide this is what has to be done. No, Your Honor. No, not at all. First of all, it was – we played a training film. I say that because if it happens in this case, it's noticed that it should be done in other venues. Your Honor, not – this is a site-specific case and a need-specific case. There was no need for the power to be on that night. It could be. These were two Amtrak officials and defense counsel. These are exhibits from the trial. This is exhibits from the trial. Yes, Your Honor. They were out there measuring the height. Do you remember the exhibit number? This is – I can get that for you, Your Honor, when we're finished. Both of these are in the appendix. The evidence was that to turn the power off, which, by the way, is identified as the primary source of safety, of protecting against this high voltage, is that the person in the field calls up to the tower, says, I'd like to turn it off. The person in the tower checks to make sure there are no trains coming through that would need it or any problem, and if so, they flick a switch. This is designed in sections. You can turn off one section and leave all the other sections on. This was a 1,900-foot train on the tail track. They could have arranged, as Your Honor, Judge Shigari has mentioned, park it in spots A to B and will turn off the power over that. There was no reason to let it on, knowing that location and what they already knew. Our case is, in fact, the type of case that the court in Edwards, the district court in Washington, D.C., cited when it contrasted a case where it should be turned off. It said, while granting summary judgment in that case, where it happened at a remote location, where they couldn't be expected practically to turn the power off, they said it should be turned off if you've got a side track, like this one was, not a main track, with no barriers to access in a residential area next to a parking lot and sidewalk where trains normally stand for long periods of time. It took just minutes to turn the power off, and the evidence was uncontradicted that if you turn it off, the lethal power is gone. There may be a little bit of a shock potential, no burns, no death. We wouldn't be here. Can I ask you what the significance of the picture is? The picture is that, just to emphasize, they can turn that power off. They can turn the power off. And when you have it a slight location out of bounds, this was taken the day after. This is also in the appendix to our exhibit from trial. This was the parking lot that the boys pulled into on their skateboards. This was the actual car that they climbed. They walked up here and climbed the ladder on this side. We have to remember how lethal this is. Less than 40 milliseconds was the time it took for that arc to leap out and run through Jeff Klein's body, leaving three-quarters of it with third-degree burns. Up to 89,000 degrees, that's what the evidence showed, 50,000 degrees Kelvin, that heat can be. It's terrible. And under the circumstances, knowing what they knew, and having a built-in safety design, they should have turned it off for that week. As a parking lot, fine. You don't need the power. Just turn it off. Again, I want to emphasize, these lines have two design features to protect against exactly this. One is their height. You keep people from getting too close. The other is the kill switch, the off switch, in case somebody may get too close. In this particular case, without the need to do so, they overrode both safety features. They pulled up a train that eliminated the protection of height, the design feature, and they didn't use the second backup feature to turn it off when they readily should have, despite what they knew. When you say they now, you seem to be referring both to Amtrak and Norfolk. But the on-off switch, I assume, is under the control of Amtrak. It is. But, Your Honor, Norfolk Southern knew everything about the hazards of these lines that Amtrak did. We had more evidence against Amtrak, and the jury reflected it with a 70-30 split, both compensatory damages and punitives. But we had enough to show reckless disregard by Norfolk Southern. We introduced, and I refer to it a moment ago, the government reports. The uncontradicted evidence was that by the time a safety hazard in an industry reaches the level of a report to Congress, everybody in the industry has long known about it. It's the trickle-down effect, they call it. Norfolk Southern knew this hazard. That's why they trained their people with the same materials that Amtrak uses to train. They've been doing this, I understand from the record, for decades. Doing? Parking cars in this area with the electricity on. Not in this area, Your Honor. The area of the accident. Of this particular accident. The evidence was only that they were doing this in 2002. There was no evidence to suggest they were doing it or doing it with any frequency like this before that. It had become a side practice, a rental agreement, that year. And that is what we say the repetition is, again, a driving force in this case. If this had just been one weekend where the stars came together, bad coincidence, this was the only time they did it, and these boys hit it there, different situation. But the uncontradicted evidence was that they were doing this, using it as a long-term parking lot, days and nights at a time, up to 50% of the time that year. It was just a matter of time it would be reasonable for the jury to find until what happened on August 10 finally happened and it caught up to them. It was just somebody was going to come with all the boys in that area. Norfolk Southern could see the same graffiti. Their engineers were using the diesels to park these trains. They pulled in there. They could see the graffiti. The graffiti is all over the back wall to the left here, and it goes down to hundreds of feet. It's in the appendix. Counselor, I see. I'm looking at graffiti. Is that actually on the train itself? That's on the train. Now, we don't ascribe that necessarily to the location here. But there was worse, much greater graffiti, and it's shown in the appendix, all over the backs of these walls, which abutted right up to the right-of-way. They were 30 feet from the tracks. This was a totally unguarded location, and not one sign put there. With these railroads knowing how lethal this was, they posted not one high-voltage warning sign, even though, again, the undisputed evidence, they knew the public isn't aware of this hazard. Is that shed that I'm looking at in the photograph, the shed that has the sign? Yes. But this is not. . . The shed has a no trespassing sign referring to the shed. It was uncultivated. If Your Honor is referring to a no trespassing sign that they refer to, if you look at those two poles that stick up to the right side, one of those is a catenary pole. The no trespassing sign was on the inside of the pole, about 15 feet high. It was tattered and old. You couldn't see it. They're skateboards, right? They did. And you couldn't see that unless you had walked up and trespassed and then happened to look up in the dark up at the sign. And it also wasn't a danger sign. It just says, don't be here. There's no high voltage. Ms. Runkelman's argument was that Norfolk Southern didn't have total control of the situation. I assume she's referring to at least in part the fact that, you know, whether the wire is live or not is under Amtrak control. Now, what's your response? That, well, they didn't have to park the train there or what? Fact, Your Honor. They asked to park it there. Fact, they pulled it in and decided where to park it there. Fact, they kept it there even when they admitted they were supposed to take it off the track on Saturday afternoon, hours before these boys ever came, put it in the safe yard where there's no catenary lines, and they didn't do it. Fact, they decided when to take it off. And, Your Honor, what Ms. Runkelman says is, with all respect, just flatly wrong. Section 386 says that when a nonpossessor of land creates or maintains an artificial condition that presents an unreasonable risk of harm, that nonpossessor is liable. Every 386 case, by definition, has a nonpossessor putting a dangerous condition on some landowner's land. So Norfolk Southern put the dangerous condition here by moving the train under the wire. That's your case, right? Artificial condition, Your Honor. They say the artificial condition is the combination. Thus, they weren't in total control. The artificial condition, if it was the combination, they created it because until they moved that train up and parked it underneath it, you had a catenary line that wasn't a danger to anybody. You had a freight car that wasn't a danger to anybody. Do they have any real discretion about it? I mean, it seems that they needed a place to park. They had this deal with Amtrak, and they rolled this thing back. They said put it on the tail track, which is what they did. Do they have any real discretion about this? That's why I asked Ms. Runkelman. Apparently, the entire tail track had a catenary line on it. And the entire line, or anywhere that they parked it, could have been de-energized while there was a stationary train. But that's not their problem, though, right? They could have asked. They could request Amtrak to make it safe. Could you just turn the line off? They did not make that request. If we accept your argument here, then it is an odd situation because the standard of liability for the third-party non-possessor is lower than for the landlord. And that's because, Your Honor, the ordinary rule of liability is ordinary care. Landowner gets an exception because of the law's regard for somebody who is the possessor of the land. But Norfolk Southern wasn't a possessor of the land. They have no claim to that immunity or that special exception. They have no right to create unreasonably a risk on this property or anywhere else. The drafters of 386 in the Pennsylvania Supreme Court, which has adopted 386 as it is written, understand that there is a difference between the landowner and the non-landowner. And they've written 386 to say, even if it's on somebody else's land, you've got the same duty of care not to create an unreasonable risk of harm to somebody else. It doesn't penalize them at all. Because Amtrak gets an exception doesn't mean that they, Norfolk Southern, are being penalized. Your case against Norfolk, then, is you only have to show, in effect, negligence, right? Negligence for the compensatory damages, and the evidence did allow a jury reasonably to find it under the circumstances. What's the will for the wanton or reckless indifference damage against Norfolk? They, again, Your Honor, it's knowing what they knew. They knew the wire could be turned off. They knew that boys climbed. They saw the neighborhood. They didn't ask. They didn't move it off when they should have. By their own admission, they were supposed to move it off. And they repeated this. Again, this wasn't the first time that Norfolk Southern ever stumbled into this and had this happen. They were doing this 50% of the time along with Amtrak. And at a certain point, well, maybe the first time is inadvertence. But time after time that they are pulling in there and seeing that neighborhood, knowing what they know about the history of kids, the danger, the public not knowing this, to continue to create that without asking that it be turned off or without even posting a sign. Norfolk Southern didn't post any signs either. They knew it was unsigned, that this is in a public area. It seemed like it was an operation that Amtrak was running. I mean, Amtrak was directing where the cars, whether the cars could go there and where. Whether, but after. Well, there can be co-liability. And the jury did find 70, 30 Amtrak. There can be joint tort fees in the law. There was nothing unusual about the jury finding that where you had two parties that contributed to this tragedy, they share responsibility about that. And it was a combination. Amtrak let them come on the property, and Norfolk Southern then kept it, didn't move it, parked it there, and ran the same tragic risk that Amtrak did. Can I ask you one more question? I asked your adversary about, with respect to the evidentiary issue, if we were to disagree with the district court, I asked him about harmless error. Would the error have been harmless? Yes, Your Honor. We could still have prevailed. Just by virtue of the government report, which was a different thing, and by virtue of the neighborhood, the environment, the clear and obvious presence, likely presence of kids around there, and the repetition, the jury could have found that this was a negligent and unreasonable disregard of a known or obvious risk with a high probability of harm. But you don't know what weight the jury would have given the evidence of prior accidents. Well, Your Honor, again, we did not, if Your Honor looks at the transcript, my closing, we did not say look at what happened in these prior accidents. All we said was they cannot deny that they know. You've seen how frequently they wrote about it. They know about this risk. And despite that knowledge, they went ahead and repeatedly did this. Okay. Mr. Rota, thank you very much. Did you have the exhibit numbers just so we can maybe make a reference? Yes, Your Honor, it is. P73 is this picture. P73, for the record, is a picture of a train. There's a blue car on the left-hand side and two buildings and a shed in the background. And we have the appendix page on that. 2209, Your Honor. Appendix page 2209, okay. And then also the P78 and the appendix page is 2213. P78, appendix page 2213. Right. Three guys with brightly colored vests. Mr. Belayne. First, preliminarily, I don't think under the standard for harmless error, this Court can conclude that it was just harmless error. I mean, that was very powerful evidence of specific incidents involving specific people over time. And a government report from 30 years ago is not that. Particularly since the rebuttal to that is, how come the FRA regulates the railroads so closely and there is not a single regulation or requirement that was violated here by Amtrak 30 years later? So I'd feel like you could take that 30-year-old report and blow it away alone, but you can't blow away all of these specific instances of people getting hurt. Zimmerman is this case. Zimmerman's got the graffiti. Zimmerman's got the trespassers all the time, actually. Zimmerman even has Amtrak cops chasing trespassers. Zimmerman has a path leading from JFK Boulevard down to the area. What Zimmerman didn't have is exactly what this case doesn't have. And Zimmerman said as much. You didn't give us a prior example of somebody climbing up the catenary here. You didn't give us an example. He says, okay, we only know they're there for six months, we're there day in and day out, and this was inevitable. It was inevitable? Then why isn't there a single example, a single example of kids playing around the boxcars? Why isn't there? There's no such evidence. Now, he talks about, you know, he shows that picture as though the train track is right there and easily accessible. There is a steep incline. And those young men were not fooled when they were going up the steep incline that they were on Amtrak property, excuse me, on railroad property. They didn't need to have a sign to see that. The exhibit that is A2208, which is Plaintiff's Exhibit 72, you have it in the appendix. It shows you what a steep incline we're talking about here. This case, if it is affirmed, means that it's a blueprint for plaintiff's attorneys to say, I thought Zimmerman was a problem, but it's not. Because all I have to do is to go to every other location up and down the corridor and bring in enough examples of other incidents and prove my case against Amtrak in this particular location, even though there's no evidence of any specific risk, because nobody has ever been in close proximity to the Katmari waters at this particular place. But I'm still going to prove my case thanks to this decision, because all I have to do is show that it happened somewhere else. And that absolutely does a 360-degree spin on Pennsylvania law. Zimmerman says there are foreseeable trespassers, but it doesn't matter. That doesn't make you liable. What they mean is, even though you know there are going to be trespassers there, you can't now heighten the duty that the railroad has as a result of it. We're going to have to finish on that. The only other thing I'd like to say, if I may, Your Honor, is we did also argue about proportionality issue with respect to punitive damages, that if you're going to have two punitive damages against each of the two, then they should be looked at separately, one for Mr. Kline, one for Mr. Birdwell. The Birdwell proportionality was over 10 to 1. I apologize for running over my time. Thank you, Mr. Blaine. Thank you. All right, we'll take the case under advisement. This case has quite a few issues, but we'll proceed as diligently as we can to give you a decision. May I see counsel here at the bench, Mr. Roda, Mr. Blaine, and Ms. Winkleman, for a moment, please. And we'll turn the microphone off, please. Thank you. Thank you. Thank you. May I see you in the back? Thank you, and thanks, everyone, again. We will take this case under advisement. We will stand recess.